RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0240p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,
*Plaintiff-Appellant*,

*v*.

FEDERAL HOME LOAN MORTGAGE CORPORATION; RICHARD F. SYRON; ANTHONY S. PISZEL; EUGENE M. MCQUADE,
*Defendants-Appellees*.

No. 25-3765

Appeal from the United States District Court for the Northern District of Ohio at Youngstown.
No. 4:08-cv-00160—Benita Y. Pearson, District Judge.

Argued: June 2, 2026

Decided and Filed: August 21, 2026

Before: MOORE, WHITE, and THAPAR, Circuit Judges.

## COUNSEL

**ARGUED:** W.B. Markovits, MARKOVITS, STOCK & DEMARCO, LLC, Cincinnati, Ohio, for Appellant. Jason D. Frank, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts, for Appellee Federal Home Loan Mortgage Corporation. James K. Goldfarb, DAVIS WRIGHT TREMAINE LLP, New York, New York, for Appellee Anthony S. Piszel. **ON BRIEF:** W.B. Markovits, Christopher D. Stock, Terence R. Coates, MARKOVITS, STOCK & DEMARCO, LLC, Cincinnati, Ohio, Richard S. Wayne, STRAUSS & TROY CO., LPA, Cincinnati, Ohio, for Appellant. Jason D. Frank, Emily E. Renshaw, Andrew M. Buttaro, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts, Hugh E. McKay, PORTER WRIGHT MORRIS & ARTHUR LLP, Cleveland, Ohio, Fred L. Black, Michael E. Kenneally, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Appellee Federal Home Loan Mortgage Corporation. James K. Goldfarb, DAVIS WRIGHT TREMAINE LLP, New York, New York, Joseph C. Weinstein, Steven A. Delchin, SQUIRE PATTON BOGGS (US) LLP, Cleveland, Ohio, for

Appellee Anthony S. Piszel. Frank Robert Volpe, SIDLEY AUSTIN LLP, Washington, D.C., for Appellee Richard F. Syron. Michael S. Doluisio, DECHERT LLP, Philadelphia, Pennsylvania, Joseph C. Weinstein, Steven A. Delchin, SQUIRE PATTON BOGGS (US) LLP, Cleveland, Ohio, for Appellee Eugene McQuade.

WHITE, J., delivered the opinion of the court in which MOORE and THAPAR, JJ., concurred. THAPAR, J. (pp. 40–48), delivered a separate concurring opinion.

---

**OPINION**

---

HELENE N. WHITE, Circuit Judge. The Ohio Public Employees Retirement System ("OPERS") brought securities-fraud claims against the Federal Home Loan Mortgage Corporation ("Freddie Mac") and three of its senior officers on behalf of itself and all purchasers of Freddie Mac's common stock from August 1, 2006 through and including November 20, 2007 (the "Class Period"). In a prior appeal, we reversed the district court's dismissal of OPERS' complaint. On remand, the district court denied OPERS' motion for class certification and granted summary judgment to all defendants. We **REVERSE IN PART, VACATE IN PART,** and **REMAND** for further proceedings.

**I.**

**A.**

The Ohio Public Employees Retirement System is a state pension fund serving more than 1.3 million Ohio public employees and more than 3,700 public employers. According to the complaint, OPERS is the 14th largest retirement system in the United States.

The Federal Home Loan Mortgage Corporation is a federally chartered corporation established to support liquidity and stability in the secondary mortgage market. By statute, Freddie Mac's business is limited to the purchase and sale of home mortgages and mortgage-related securities. *See* 12 U.S.C. § 1454(a)(1). Freddie Mac holds mortgage loans and securities for investment purposes. During the Class Period, Freddie Mac "purchased loans, securitized them, and guaranteed the payment of principal and interest on these mortgage-related securities."

Freddie Mac's Brief at 8. The individual defendants were officers of Freddie Mac during the Class Period, including Richard F. Syron, the former Chairman of the Board and Chief Executive Officer, Anthony S. Piszel, the former Executive Vice President and Chief Financial Officer, and Eugene M. McQuade, the former President and Chief Operating Officer (collectively "individual defendants").[1]

To finance the purchase of mortgages and mortgage-related securities, Freddie Mac issues debt and stock offerings. Freddie Mac maintains a Credit Guarantee Portfolio and an Investment Portfolio. The Credit Guarantee Portfolio contains the Single-Family Guarantee Portfolio, "which guarantees the payment of principal and interest on residential mortgages that it purchases in the secondary market." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 380 (6th Cir. 2016) ("*OPERS I*"). Freddie Mac securitizes these mortgages as mortgage-backed securities. *Id.* The Credit Guarantee Portfolio also contains a much smaller multifamily segment. The Investment Portfolio is Freddie Mac's "Retained Portfolio," which holds mortgage loans and mortgage-related securities for purposes of investment. Freddie Mac's Brief at 8.

Freddie Mac "monitors loan quality through its proprietary automated underwriting system Loan Prospector." *OPERS I*, 830 F.3d at 380. Loan Prospector assigns loans one of six grades: The highest grades, A+, A1, A2, and A3, are "Accept Loans," which can be automatically underwritten; the remaining grades, C1 and C2, are "Caution Loans," which carry higher risk and require manual underwriting. *Id.*

**B.**

In the early 2000s, loan activity declined, leading mortgage producers "to market more and riskier nontraditional loan products." R. 166, PageID 5588. "While these products carried a higher likelihood of default, they also earned higher fees than prime mortgages." *OPERS I*, 830 F.3d at 380. OPERS alleges that "Freddie Mac reassured investors that it maintained conservative underwriting standards and had limited exposure to the risky mortgage products

---

[1]The parties stipulated to the dismissal of defendant Patricia L. Cook, the former Chief Business Officer and Executive Vice President of Freddie Mac, who passed away while this case was pending.

that were wreaking havoc with other mortgage-related financial institutions." Appellant's Br. at 4. But in reality, OPERS alleges, "Freddie Mac had abandoned its supposedly 'disciplined' underwriting standards for the vast majority of loans it was servicing, accumulating massive exposure to subprime, Alt-A and other nontraditional mortgages." *Id*. at 4-5. And, OPERS argues, when Freddie Mac revealed its true exposure, the price of its stock fell, causing the financial harm that forms the basis of the complaint.

OPERS filed its initial complaint on January 18, 2008, and subsequently filed three amended complaints, each of which withstood a motion to dismiss. After the case was reassigned because the presiding judge recused himself, the district court granted Freddie Mac's renewed motion to dismiss, concluding that OPERS had failed to adequately plead loss causation. We reversed, concluding that OPERS had adequately pleaded loss causation through its "materialization of the risk" theory. *OPERS I*, 830 F.3d at 385.

After the case returned to the district court, OPERS moved for class certification and the parties brought cross motions to exclude one another's experts. The district court denied OPERS' motion for class certification, granted Freddie Mac's motion to strike OPERS' expert, and denied OPERS' motion to strike Freddie Mac's experts. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, at *1 (N.D. Ohio Aug. 14, 2018) ("*Class Cert. Order*"). OPERS then sought leave to appeal the district court's denial of its class-certification motion under Federal Rule of Civil Procedure 23(f), which we denied. *In re Ohio Pub. Emps. Ret. Sys*., No. 18-0310, 2019 U.S. App. LEXIS 2337, at *2-3 (6th Cir. Jan. 23, 2019). OPERS then asked the district court to enter summary judgment for Freddie Mac, arguing that rulings made in conjunction with the class-certification decision were case-dispositive, and the district court entered summary judgment over Freddie Mac's objection. OPERS appealed again and we concluded that we lacked jurisdiction because "where a plaintiff manufactures a dismissal in [this] manner . . . there is no final judgment, and thus there is no appellate jurisdiction." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 64 F.4th 731, 735 (6th Cir. 2023) ("*OPERS II*").

Back before the district court, defendants again sought summary judgment, which the district court granted. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No.

4:08CV0160, 2025 WL 2494544, at *1 (N.D. Ohio Aug. 29, 2025) ("*Summary Judgment Order*"). OPERS now appeals the district-court orders denying class certification, excluding the testimony of OPERS' expert, and granting summary judgment to defendants.

**II.**

We first address the district court's order denying class certification. OPERS brought claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Under Section 10(b) and Rule 10b-5, a securities-fraud suit has six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) ("*Omnicare II*") (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)).

OPERS sought class certification under Federal Rule of Civil Procedure 23(b)(3), which requires a court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). We review a district court's order rejecting class certification for abuse of discretion. *Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 643 (6th Cir. 2006). "The district court maintains substantial discretion in determining whether to certify a class, as it possesses the inherent power to manage and control its own pending litigation. However, we will find an abuse of discretion when the district court relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Id.* at 643-44 (citation modified).

In its class-certification order, the district court determined that OPERS could not establish reliance in a manner common to the class and that it had not demonstrated that damages were measurable on a class-wide basis. *Class Cert. Order*, 2018 WL 3861840, at *20. Because the district court relied on a faulty premise, we vacate its denial of class certification.

**A.**

"Most plaintiffs in Rule 23(b)(3) securities-fraud class actions hope to establish a presumption of reliance, which makes it easier to establish predominance by 'prov[ing] reliance through evidence common to the class.'" *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 602 (6th Cir. 2025) (quoting *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 119 (2021)). In a misrepresentation case like this one, a plaintiff seeking a presumption of reliance "must establish: '(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.'" *Id.* (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014)). In its class-certification order, the district court addressed only number three, concluding that OPERS had not demonstrated that Freddie Mac's stock traded in an efficient market. We disagree and conclude that Freddie Mac traded in an efficient market.[2] We also disagree with portions of the district court's analysis of whether Freddie Mac has rebutted the presumption of reliance and so remand for reconsideration of that issue.

OPERS seeks to establish market efficiency through the expert reports and testimony of finance professor Dr. Steven P. Feinstein. Dr. Feinstein's report concludes that the market for Freddie Mac's common stock was efficient during the class period. If correct, the efficiency of the market would create a presumption of reliance, given that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).

The district court rejected OPERS' motion for class certification, concluding that (1) OPERS could not establish reliance because it could not establish market efficiency; (2) even if OPERS could establish market efficiency and create a presumption of reliance, Freddie Mac could rebut that presumption; and (3) OPERS failed to demonstrate that common issues of law

---

[2]The parties do not dispute (1) that the purported misrepresentations at issue were publicly known and (4) that OPERS traded Freddie Mac's stock during the Class Period. The parties and the district court addressed materiality in connection with summary judgment and so we will as well. Because we find that the purported misrepresentations were material, our finding of market efficiency here is sufficient to establish OPERS' entitlement to the presumption of reliance. *See infra III.A.1.*

and fact would predominate over individual issues with respect to its claim of reliance. The district court also granted Freddie Mac's motion to strike Dr. Feinstein's reports and exclude his testimony.

1.

We first examine whether OPERS has demonstrated market efficiency, which would create a presumption that it relied on any material misrepresentations.[3] We have identified the following five factors as probative of market efficiency: "(1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases." *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)). The parties refer to these as the *Cammer* factors. The parties also point to additional structural factors probative of an efficient market. Three such factors are set out in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001), namely "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders." *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017) (quoting *Krogman*, 202 F.R.D. at 474). One final

[3]The parties first disagree about the level of market efficiency needed to invoke the *Basic* presumption, referring to the so-called efficient capital markets hypothesis. As the district court explained, "Economists identify three general forms of the efficient capital markets hypothesis: '*First* is the weak form, which asserts simply that the current share price in an efficient market reflects all information about past share prices. If the weak form of the hypothesis accurately describes a market, it is impossible to predict future prices using only past prices. *Second*, the semi-strong form, which asserts that a share price in an efficient market reflects all public information concerning the security (including but not limited to past share prices). *Third*, the strong form, which asserts that all relevant information, public and private, is reflected in the price of securities in an efficient market. The strong form has been widely discredited.'" *Class Cert. Order*, 2018 WL 3861840, at *8 (quoting *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 97 n. 148 (S.D.N.Y. 2009)). The district court determined that a plaintiff must establish semi-strong-form efficiency to apply the *Basic* presumption. *Id.* at *9. Freddie Mac agrees. OPERS disagrees, arguing that the Supreme Court in *Halliburton* "clarified that a plaintiff need only demonstrate a stock traded in a 'generally efficient' market." Reply Br. at 9 (quoting *Halliburton*, 573 U.S. at 279).

The district court and Freddie Mac are correct. As the Supreme Court recently clarified, "The *Basic* presumption is premised on the theory that investors rely on the market price of a company's security, which in an efficient market incorporates all of the company's public misrepresentations." *Goldman Sachs*, 594 U.S. at 117. In the language of the efficient-market-hypothesis forms, that is a "semi-strong" form of efficiency. *Initial Pub. Offering*, 260 F.R.D. at 97 n.148.

factor is whether a security is traded on a national exchange. *See, e.g.*, *Huberman v. Tag-It Pac. Inc.*, 314 F. App'x 59, 63 (9th Cir. 2009).

The parties agree that the first three *Cammer* factors are met.[4] *Class Cert. Order*, 2018 WL 3861840, at *16. The parties also agree that the *Krogman* factors are met and that Freddie Mac was traded on the New York Stock Exchange. *Id.* The parties dispute the fifth *Cammer* factor. The district court determined that the fifth *Cammer* factor was the most important and that Dr. Feinstein did not sufficiently establish it. *Id.* at *17. The district court therefore concluded that OPERS failed to establish market efficiency and could not establish reliance.

We disagree and conclude that OPERS carried its burden to establish market efficiency. The district court's conclusion to the contrary rested on its improper elevation of the fifth *Cammer* factor and its related misunderstanding and rejection of OPERS' price-maintenance theory. *Reeb*, 435 F.3d at 644 (abuse of discretion occurs when the district court applies the wrong legal standard).

The district court concluded that Dr. Feinstein failed to demonstrate market efficiency because he relied on a single-date event study—the last day of the class period—to assess market efficiency for the entire Class Period. *Class Cert. Order*, 2018 WL 3861840, at *2. Event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton*, 573 U.S. at 280. As the district court accurately observed, event studies typically demonstrate market reaction on far more days than the single day chosen by Dr. Feinstein. *See, e.g.*, *George v. China Auto. Sys., Inc.*, No. 11-cv-7533, 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013); *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 180 (S.D.N.Y. 2012). The district court therefore concluded that Dr. Feinstein's event study was unreliable.

---

[4]The parties do not focus on the fourth *Cammer* factor, the corporation's eligibility for S-3 registration. According to Dr. Feinstein's report, "[a] company is eligible for S-3 registration when, among other things, it has filed Exchange Act reports for a specified length of time and has outstanding float above a certain sizable value." R. 372-3, PageID 18534. As Freddie Mac points out, Dr. Feinstein concedes that Freddie Mac was not eligible for S-3 registration during the class period. Dr. Feinstein contends, however, that Freddie Mac maintained more than sufficient float ($42.1 billion) and made public filings equivalent to those required for S-3 eligibility. *Id.*, PageID 18536-37. He therefore argues that, while not technically eligible because it was a government-sponsored enterprise that did not file Exchange Act reports, Freddie Mac "possessed the float and information provision characteristics underlying why S-3 eligibility is indicative of market efficiency." *Id.*, PageID 18537.

The district court further discounted the z-test[5] performed by Dr. Feinstein, through which he sought to support his conclusion that the market was efficient. The z-test analyzed "whether Freddie Mac's stock price was statistically more likely or equally likely to fluctuate on 'news days' versus 'non-news days.'" *Class Cert. Order*, 2018 WL 3861840, at *5. The z-test found that Freddie Mac's stock reacted to news in a statistically significant manner on four days out of a total of nine news days, a far higher proportion of high-movement days compared with the proportion of high-movement days among the non-news days. *Id*. Dr. Feinstein also ran diagnostic tests on his z-test to confirm its accuracy and reliability. *Id.* at *6. The district court concluded that the sample size for the z-test was too small and that the diagnostic tests did not save it because of a structural break[6] in the average price volatility of Freddie Mac's stock. *Id.*

Having discounted Dr. Feinstein's event study and related z-test, the district court determined that Dr. Feinstein failed to make a showing on the fifth *Cammer* factor and that this failure was fatal to OPERS' claim of market efficiency. *Id.* at *17 ("The structural *Cammer* factors are not enough, alone, to establish market efficiency."). The district court rejected OPERS' argument that additional evidence of price impact was unnecessary under its theory of price maintenance. The district court found that OPERS could not "meaningfully argue that the misrepresentations artificially maintained the price of the stock until risks materialized, as that argument proves too much at the class certification stage, where OPERS has the burden of persuasion as an evidentiary matter." *Id.* at *18. It cited an opinion from the Southern District of New York for the proposition that "price maintenance theory is patently deficient." *Id.* (quoting *In re Credit Suisse First Boston Corp. (Lantronix Inc.) Analyst Sec. Litig*., 250 F.R.D. 137, 145 (S.D.N.Y. 2008)).

---

[5]Before the district court, Dr. Feinstein described the z-test in this context as a test "that collectively compares the differential incidence of significant stock price movements across two groups of dates, where one group comprises dates with high information flow and the second group is composed of dates with less information flow." R. 355-5, PageID 16040.

[6]A structural break is a market disruption after which the average volatility of the stock price is different than before the break. *Class Cert. Order*, 2018 WL 3861840, at *6 n. 5. Here, Freddie Mac's expert financial economist, Dr. Mukesh Bajaj, and the district court identified a structural break on February 27, 2007, meaning that price movements on earlier dates are not probative of efficiency on later dates. Before the district court, Dr. Bajaj explained that market-wide events caused increased volatility starting on February 27, 2007, causing the structural break.

The district court's analysis suffers from several fatal flaws. Most significantly, it rejected OPERS' price-maintenance theory. In *OPERS I*, we expressly recognized "the alternative theory of materialization of the risk." 830 F.3d at 384-85 (citing *In re Omnicom Grp., Inc. Sec. Litig*., 597 F.3d 501, 511 (2d Cir. 2010)). As the Second Circuit explained, under the materialization-of-the-risk theory, a plaintiff demonstrates loss causation by showing "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *In re Omnicon Grp., Inc. Sec. Litig.*, 597 F.3d at 513 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007)). A plaintiff can point to a corrective disclosure of the fraud or a "'negative investor inference[]' drawn from a particular event or disclosure." *OPERS I*, 830 F.3d at 384-85 (quoting *In re Omnicon Grp., Inc. Sec. Litig.*, 597 F.3d at 511).

The price-maintenance theory is the corollary of the materialization-of-the-risk theory, applied to demonstrate price impact rather than loss causation. Price-maintenance theory, as the Second Circuit explained, "recognizes 'that statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price.'" *Waggoner*, 875 F.3d at 104 (quoting *In re Vivendi*, 838 F.3d 223, 256 (2nd Cir. 2016)). It thus describes the price impact of misrepresentations in a case where the plaintiff has alleged loss causation on a materialization-of-the-risk theory—although the misrepresentations do not cause further inflation, they do cause the stock to maintain an inflated price.

We therefore reject the district court's conclusion that OPERS cannot argue that "misrepresentations artificially maintained the price of the stock until risks materialized." *Class Cert. Order*, 2018 WL 3861840, at *18. The district court should have credited OPERS' theory under which defendants' misstatements did not cause the price of Freddie Mac's stock to increase, but rather maintained its price at an artificially inflated level compared with the value of the stock in absence of the misrepresentations.

The district court's improper rejection of the price-maintenance theory impacted its market-efficiency analysis. Under the fifth *Cammer* factor, the district court required OPERS to demonstrate a history of immediate price impact based on news. It is doubtful that a showing on

the fifth *Cammer* factor is always required, especially "in cases involving the common stock of large financial institutions, traded frequently on a national exchange." *Waggoner*, 875 F.3d at 98 (finding that a plaintiff need not make a showing on the fifth *Cammer* factor to demonstrate market efficiency and invoke the *Basic* presumption); *see also Dougherty v. Esperion Therapeutics, Inc.*, No. 16-10089, 2020 WL 6793326, at *4 (E.D. Mich. Nov. 19, 2020) (explaining that while "several courts have found the fifth *Cammer* factor to provide the best evidence of efficiency, most do not treat it as strictly necessary in making the market efficiency determination"). And of relevance here, we have suggested that a security traded on the New York Stock Exchange is likely to be in an efficient market. *Freeman*, 915 F.2d at 199.

Requiring a strong showing on the fifth *Cammer* factor is particularly problematic here. Relying on the price-maintenance theory, OPERS asserts that the fraudulent statements maintained an elevated price—not that the statements caused the price to increase. It is therefore unsurprising that Dr. Feinstein struggled to find days on which the market responded to statements made by defendants because under OPERS' theory, the statements maintained Freddie Mac's stock price rather than increased it. Relatedly, Freddie Mac's expert found the absence of efficiency because "the alleged misstatements in the case at bar did not impact Freddie Mac's stock price." *Class Cert. Order*, 2018 WL 3861840, at *18; *see also* R. 383-2, PageID 18904 ("Assuming for the sake of argument that Freddie Mac's stock traded in an efficient market, the Company's stock price would be expected to react quickly and logically to an alleged misrepresentation if it was material."). However, the fact that Freddie Mac's stock price did not react to the alleged misrepresentations is consistent with OPERS' theory of price maintenance—specifically, that the misrepresentations at issue artificially maintained Freddie Mac's stock at a consistent inflated price.

In some ways, OPERS' price-maintenance theory has more in common with an omissions-based theory of securities fraud than a misrepresentations-based theory. "In cases 'involving primarily a failure to disclose,' the *Affiliated Ute* presumption establishes a presumption of reliance if an alleged wrongdoer had an 'obligation to disclose' and 'the facts withheld [are] material in the sense that a reasonable investor might have considered them important in the making of [a] decision [to invest].'" *In re FirstEnergy Corp. Sec. Litig.,* 149

F.4th at 602 (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)). Operating under a pure omissions-based theory, a securities-fraud plaintiff need not establish market efficiency to create a presumption of reliance. That relaxed standard for demonstrating reliance is appropriate because of the "unique problem . . . of showing reliance on something that was never said." *Id.* at 603. "*Affiliated Ute* applies to cases purely or primarily based on omissions." *Id.* at 606. Here, although OPERS' case is not primarily based on omissions, the price-maintenance theory implicates similar concerns—the difficulty of proving price impact (and therefore reliance) when the purported fraud maintains an elevated stock price. Accounting for this concern, we conclude that the structural evidence of efficiency is sufficient in this case, particularly given that OPERS made some showing that the market responded as expected when the risk materialized.

Our conclusion that Freddie Mac traded in an efficient market is hardly surprising given its size and the national attention it drew at the time. Freddie Mac's stock traded at a high volume on the New York Stock Exchange—Dr. Feinstein estimated that four million shares changed hands daily. Freddie Mac was followed by both financial firms and news outlets—Dr. Feinstein's analysis demonstrated that at least 21 financial-analyst firms followed Freddie Mac and thousands of news articles were published on Freddie Mac during the class period. Freddie Mac had numerous market makers—financial intermediaries trading a particular security. Although not eligible for S-3 registration, Freddie Mac had many of the qualities that make a security eligible for S-3 registration. Freddie Mac had extremely high market capitalization, unsurprising given its size. It had a high level of float—the number of shares outstanding minus the shares held by insiders and affiliates. A stock with high float has a large number of shares outstanding that are available for trading by investors in the open market, and is thus likely to attract greater analyst and news media attention—characteristics indicative of market efficiency. Finally, it had a narrow bid-ask spread—the difference in price between market makers buying and selling the security—indicating active trading and responsiveness to public information about the security. These structural factors support our conclusion that Freddie Mac's stock traded in an efficient market.

2.

When a plaintiff invokes a presumption of reliance based on market efficiency, "a defendant [can] rebut this presumption in a number of ways, including by showing that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no price impact." *Halliburton*, 573 U.S. at 263-64 (citation modified). The district court found that Freddie Mac expert "Dr. Bajaj's report demonstrates that the alleged misstatements in the case at bar did not impact Freddie Mac's stock price, rebutting the presumption of reliance." *Class Cert. Order*, 2018 WL 3861840, at *18. But this analysis repeats the same mistake that the district court made in its rejection of OPERS' price-maintenance theory. The fact that Freddie Mac's stock price did not change in response to the alleged misrepresentations does not rebut the presumption of reliance in a case premised on price-maintenance theory. Indeed, one would expect to see no price change in response to misrepresentations and omissions designed to hide an emerging risk.

The district court also cited Dr. Bajaj's conclusion that the disclosures on November 20, 2007 were not linked to the alleged misrepresentations and omissions. *Id.* at *18. If true, that would "sever[] the link between the alleged misrepresentation and . . . the price" of Freddie Mac's stock, effectively rebutting the *Basic* presumption of reliance. *Halliburton*, 573 U.S. at 269. But the district court did not clearly adopt Dr. Bajaj's finding on this point. Further, because we reject other elements of the district court's analysis of Freddie Mac's attempted rebuttal of the presumption of reliance, it is not clear whether this portion of Dr. Bajaj's report, alone, demonstrates lack of price impact by a preponderance of the evidence. *In re Acadia Healthcare Co.*, No. 22-0506, 2023 WL 3620955, at *2 (6th Cir. May 23, 2023) (when the plaintiff moves for class certification and establishes the *Basic* presumption, "the defendant bears the burden of persuasion to prove a lack of price impact, which it must show by a preponderance of the evidence") (citation modified); *Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485 (2d Cir. 2018). We therefore vacate the district court's conclusion that Freddie Mac rebutted the presumption of reliance and remand for reconsideration of the evidence in light of OPERS' valid theory of price maintenance.

3.

In addition to concluding that OPERS failed to establish reliance through evidence of market efficiency, the district court concluded that OPERS "has not adequately demonstrated that common issues of law and fact will predominate over individual issues with respect to the reliance element of its Exchange Act claims." *Class Cert. Order*, 2018 WL 3861840, at *20. But given the district court's conclusion that OPERS could not establish reliance, it would be impossible for OPERS to demonstrate that common issues of fact and law predominate in its proof of reliance. Consequently, we vacate and remand for reconsideration of commonality in light of our price-maintenance analysis.

**B.**

The district court also determined that OPERS failed "to establish that damages can be measured on a class-wide basis in a manner consistent with its theories of liability." *Class Cert. Order*, 2018 WL 3861840, at *20. "Class certification under Rule 23(b)(3) requires that a plaintiff establish 'that damages are capable of measurement on a classwide basis.'" *FirstEnergy Corp. Sec. Litig.*, 149 F.4th at 620 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). Here, Dr. Feinstein testified only in general terms that damages could be calculated on a classwide basis but did not testify to the specifics of which model he would use. For example, he stated, "valuation tools, which would include event study analysis such as that described herein, and potentially other empirical analyses if necessary, would be used to establish that the disclosure(s), correcting the alleged misrepresentations and omissions, caused the price of Freddie Mac common stock to fall." R. 372-3, PageID 18555. To properly calculate damages, OPERS will have to differentiate the portion of the decrease in stock price attributable to defendants' misrepresentations and the portion of the decrease attributable to other market factors. Dr. Feinstein's general reference to an event study and "other empirical analyses" is insufficient. *Id.* Without providing a more specific proposal, neither Freddie Mac nor the court can understand the feasibility of measuring damages on a classwide basis.

Given OPERS' failure to identify a more specific calculation methodology, the district court did not abuse its discretion in concluding that OPERS failed to establish that damages

could be measured on a classwide basis. However, the district court's rejection of the damages measurement was bound up in its rejection of OPERS' price-maintenance theory. And we are not a court of first review. So on remand, the district court shall permit OPERS to refile its motion for class certification with a specific proposal for calculating damages under the price-maintenance theory. *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 581 (C.D. Cal. 2014); *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 144 (S.D.N.Y. 2014); *Sicav v. James Jun Wang*, No. 12 CIV. 6682 PAE, 2015 WL 268855, at *7 (S.D.N.Y. Jan. 21, 2015).

**C.**

Finally, the district court granted Freddie Mac's motion to exclude the testimony and reports of Dr. Feinstein. Under Federal Rule of Evidence 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). *Daubert* affords the district court "broad latitude" to determine reliability. *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 391 (6th Cir. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). "In determining whether proffered expert testimony meets this standard, district courts generally make three inquiries: (1) is the witness *qualified* by knowledge, skill, experience, training, or education?; (2) is the testimony *relevant*, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue?; and (3) is the testimony *reliable* under the factors outlined in Fed. R. Evid. 702 and the Supreme Court's decision in *Daubert*?" *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019) (citation modified). "But 'rejection of expert testimony is the exception, rather than the rule.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments) (citation modified).

The district court's rejection of Dr. Feinstein's testimony was bound up in its rejection of the price-maintenance theory underlying Dr. Feinstein's testimony, leading the district court to improperly elevate the fifth *Cammer* factor and erroneously conclude that the absence of stock movement in response to the purported misrepresentations indicates no price impact. In addition, the district court noted that Dr. Feinstein impermissibly offered legal conclusions.

But even if a portion of Feinstein's report relayed legal conclusions, that would not be grounds for excluding the significant portions that opined on economic facts. *See Babb*, 942 F.3d at 316 ("[T]he district court used a sledgehammer, when the law required that it use only a scalpel."). Finally, the district court pointed to an opinion by the Delaware Court of Chancery that rejected Dr. Feinstein's expert opinions. In that case, the court noted that Dr. Feinstein was "an experienced academic" but that he had "no real experience in the telecommunications or cable industries" at issue. *Finkelstein v. Liberty Digital, Inc.*, No. CIV.A. 19598, 2005 WL 1074364, at *13 (Del. Ch. Apr. 25, 2005). It therefore rejected his valuation analysis of shares of a company that had survived a merger as a wholly owned subsidiary. *Id.* But that specialized subject matter was far afield from this case, which falls well-within Dr. Feinstein's financial expertise as a Chartered Financial Analyst, finance professor, and owner of a financial research firm. And even if that case could cut against Dr. Feinstein's reliability, it alone is insufficient to exclude his testimony in full (indeed, the *Finkelstein* opinion did not disqualify him as an expert; it simply discounted his opinions). We therefore vacate the district court's exclusion of Dr. Feinstein's testimony and remand for the district court to consider the admissibility of his testimony in light of our price-maintenance analysis.

* * *

In sum, we vacate the district court's order denying class certification, reverse its determination that Freddie Mac's stock did not trade in an efficient market, vacate its exclusion of Dr. Feinstein's testimony, and remand with instructions to allow OPERS another opportunity to seek class certification.

## III.

We next review de novo the district court's order granting summary judgment to defendants. *Bilyeu v. UT-Battelle, LLC*, 154 F.4th 396, 402 (6th Cir. 2025). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, we "draw all reasonable inferences for the nonmoving party," but need not "accept mere conjecture and speculation." *Patterson v. Kent State Univ.*, 155 F.4th 635, 644 (6th Cir. 2025). Rather, the

nonmoving party must present "significant probative evidence" placing material facts in doubt. *Walden v. Gen. Elec. Int'l, Inc*, 119 F.4th 1049, 1057 (6th Cir. 2024) (quoting *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 526 (6th Cir. 2023)).

The district court determined that there were no genuine issues of material fact and so defendants were entitled to summary judgment on OPERS' substantive securities-fraud claim under Section 10(b) and OPERS' claims of control-person liability under Section 20(a). We disagree with both conclusions.

**A.**

Section 10(b) provides "a right of action to purchasers or sellers of securities injured by its violation." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007). By its terms, Section 10(b) prohibits any person from using "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Promulgated under Section 10(b), Rule 10b-5 prohibits the making of "any untrue statement of a material fact" or the omission of "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). A Section 10(b) and Rule 10b-5 securities-fraud claim has six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Omnicare II*, 769 F.3d at 469 (quoting *Matrixx*, 563 U.S. at 37-38).

The district court determined that OPERS failed to demonstrate (1) that the defendants made materially false or misleading statements, (2) scienter, (3) reliance, (4) loss causation, or (5) a proposed damages calculation and so it granted summary judgment to defendants. That grant of summary judgment was erroneous.

1.

First, taking the evidence in the light most favorable to OPERS, a reasonable juror could conclude that defendants made materially false or misleading statements. A false statement is

actionable if the plaintiff can show that "the statement concerned a material fact and that it was objectively false or misleading" or, where the misrepresentation concerns "soft information" like predictions and matters of opinions, if the statement was "made with knowledge of its falsity." *Omnicare II*, 769 F.3d at 470 (quoting *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 945-46 (6th Cir. 2009) ("*Omnicare I*")). Omissions are also actionable based on a defendant's "failure to disclose information when it had a duty to do so." *Id.* at 471.

False statements and omissions are both subject to Section 10(b)'s materiality standard. Under this standard, "misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available." *Id.* at 472 (citation modified) (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir.1997)). As the Supreme Court has recognized, "[d]isclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress." *Basic*, 485 U.S. at 234. To that end, the Securities Acts "substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus . . . achieve a high standard of business ethics in the securities industry." *Id.* (quoting *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963)). In context, the materiality requirement "filter[s] out essentially useless information that a reasonable investor would not consider significant, even as part of a larger mix of factors to consider in making his investment decision." *Omnicare II*, 769 F.3d at 472 (citation modified) (quoting *Basic*, 485 U.S. at 234).

OPERS claims that defendants made false statements falling into four categories: (i) subprime exposure, (ii) Alt-A exposure, (iii) credit risk exposure, and (iv) underwriting standards. Viewing the evidence in the light most favorable to OPERS and drawing all reasonable inferences in OPERS' favor, OPERS has shown that a reasonable juror could conclude that defendants made materially false statements about Freddie Mac's subprime and Alt-A exposure but not its credit risk and underwriting standards.

*a. Subprime Exposure*

The "primary fraud" alleged in the operative complaint is defendants' purported "failure to disclose Freddie Mac's true subprime exposure." R. 166, PageID 5571. OPERS claims that "[t]hroughout the Class Period, Defendants made affirmative misstatements of fact with respect to Freddie Mac's exposure to mortgage loan losses." *Id.* At summary judgment, OPERS produced various statements made by or attributed to defendants minimizing the subprime exposure of Freddie Mac's portfolio. On appeal, OPERS focuses on three statements.

First, it points to a public speech delivered on May 14, 2007, in which CEO Syron stated, "at the end of 2006, Freddie [Mac] had basically no subprime exposure in our [single-family] guarantee business." R. 558-25, PageID 43674. Second, it points to an earnings call on March 23, 2007, in which CFO Piszel stated, "we have little to no exposure to . . . subprime risk layered mortgage products." R. 558-24, PageID 34536. Finally, it points to an Information Statement published by Freddie Mac on August 30, 2007, which characterized subprime loans as those which "serve borrowers with poor credit payment histories and . . . typically have a mix of [negative] credit characteristics," and quantified the subprime exposure at "approximately $2 billion, or 0.1 percent" of the portfolio as of June 30, 2007. R. 559-15, PageID 45096-97.

OPERS contends that these statements were false. It argues that Freddie Mac knew that its subprime exposure was significantly higher than it reported. It points out that Loan Prospector, Freddie Mac's proprietary automated underwriting system, classified caution loans as subprime. R. 559-86, PageID 44106; R. 559-89, PageID 44160; *see also* R. 559-88, PageID 44151 (email to management indicated that subprime loans "would score Caution in LP"). In 2007, the Monthly Monitoring report indicated that C1 and C2 loans constituted 10.8% of Freddie Mac's portfolio. In a similar vein, OPERS notes that Freddie Mac's "Segmentor" model predicted the likelihood that a given loan is subprime, and that the model indicated subprime exposure in Freddie Mac's 2007 batch of loans was between 9.53% and 11.50% in July 2007.

Next, OPERS points to an internal email from Freddie Mac's Head of External Reporting Doug Levy who warned, before Syron's speech on May 17, 2007, "[c]ertainly our portfolio includes loans that under some definitions would be considered subprime. . . . We should

reconsider making as sweeping a statement as we have 'basically no subprime exposure.'" R. 559-102, PageID 40985. OPERS also points to an internal presentation given to the individual defendants stating that, in February 2007, Freddie Mac "already purchase[d] subprime-like loans... but with considerably lower fees" and that the "[w]orst 10% of [Freddie Mac's] Flow Business" in 2006 were subprime-like loans. R. 559-122, PageID 44550. At a Board presentation in March 2007, the individual defendants were again told Freddie Mac "already purchase[d] subprime-like loans." R. 559-101, PageID 44294.

Freddie Mac contends that it "participated in the subprime market only in the precise ways it disclosed," and that its SF Guarantee Portfolio did not purchase subprime loans except a small amount of previously disclosed and purchased "T-deals." Freddie Mac's Br. at 20.[7] Freddie Mac cites both internal and external reports stating that, during the Class Period, it had no subprime loans in its SF portfolio.

In response to OPERS' accusations, Freddie Mac argues that "no generally accepted definition of 'subprime' existed." *Id*. at 21. For example, Freddie Mac's annual report in 2006 stated that the company did not categorize the loans in its credit guarantee portfolio as either prime or subprime, but estimated that it had essentially no subprime exposure "based on lender-type, underwriting practice and product structure." R. 548-21, PageID 30351. Levy's email, Freddie Mac argues, thus simply indicates Levy's belief that Syron's statement was true and his recommendation that Syron more closely follow the language in Freddie Mac's disclosure, which stated that it had no internal definition of "subprime." Freddie Mac's Br. at 22. Further, Freddie Mac argues that if "subprime" refers to a credit score under 620, anyone could determine Freddie Mac's exposure to such loans through its public filings. *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 182-83 (S.D.N.Y. 2012) ("Freddie Mac disclosed that 6% of its purchases during 2007 were of loans to borrowers with credit scores less than 620, and 11% were of loans to borrowers with credit scores between 620 and 659. These disclosures formed part of the 'total mix' of information available. Through simple arithmetic (11 + 6),

---

[7]The defendants state that T-deals, a subprime-backed structure security, constituted 0.1 or 0.2 percent of the SF Guarantee Portfolio.

investors could ascertain that 17% of Freddie Mac's purchases involved credit scores less than 660.").

Finally, Freddie Mac dismisses the statements of its own employees describing its "Caution Loans" as subprime, stating that they were using the term "pejoratively" or as a "shorthand." Freddie Mac's Br. at 24. Freddie Mac argues that these statements do not demonstrate that its exposure to subprime loans exceeded its disclosure.

The district court agreed with Freddie Mac. It concluded that Freddie Mac's internal risk management systems "served different purposes than the public disclosures." *Summary Judgment Order*, 2025 WL 2494544, at *3. Therefore, it was reasonable for Freddie Mac to internally track caution loans and publicly disclaim exposure to subprime loans. The district court credited Freddie Mac's suggestion that the authors of internal documents using the terms "subprime" or "subprime-like" were using those terms "pejoratively," not to indicate actual subprime loans. *Id.*

Upon review of the record as a whole and taking the facts in OPERS' favor, OPERS has provided evidence sufficient to show that there is a genuine dispute of material fact regarding whether defendants made false or misleading statements about Freddie Mac's subprime exposure. Rule 10b-5(b) "requires disclosure of information necessary to ensure that statements already made are clear and complete." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024). In the light most favorable to OPERS, Freddie Mac stated, through its executives and publicly filed reports, that it had basically no subprime exposure. But the evidence indicates that Freddie Mac understood that it had far greater exposure to loans that many would consider subprime because of their risk-layered characteristics—indeed, loans that its own employees referred to as "subprime" but that were not disclosed as such. Nor were the statements of Syron and Piszel qualified by reference to a clearly comprehensible definition of "subprime." A reasonable jury could find that Freddie Mac misled investors by publicly disclaiming any subprime exposure without acknowledging significant exposure to loans that many would consider subprime. *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another").

A reasonable juror could find that by disclaiming subprime exposure and not revealing exposure to Caution loans that investors could reasonably consider subprime, Freddie Mac "omit[ted] to state a material fact necessary . . . to make [its] statements . . . not misleading." 17 C.F.R. § 240.10b–5.

This case resembles the *Omnicare* securities litigation. In that case, the defendant made public representations about its compliance with the law despite internal audits revealing fraud. *Omnicare II*, 769 F.3d at 462, 477-78. We held that the plaintiff had adequately pleaded material misrepresentation based on affirmative statements and omissions, noting that the defendant "had a duty to disclose the results of the audits after issuing its material-compliance statements." *Id.* at 480-81. Here too, a reasonable juror could determine that Freddie Mac, having made affirmative representations about its subprime exposure, had a duty to disclose its exposure to Caution loans, given that investors could reasonably view those loans as subprime.

This case is also similar to *City of Monroe Employees Retirement System v. Bridgestone Corporation*, 399 F.3d 651 (6th Cir. 2005). In that case, a tire manufacturer made various vague statements of self-praise and confidence about the quality of its tires, which we found to be non-actionable puffery. *Id.* at 671. But we came to a different conclusion regarding a public release stating that the company continually monitored the performance of its tires "and the objective data clearly reinforces our belief that these are high-quality, safe tires." *Id.* at 671-72. This statement was made in the context of significant safety concerns leading to multiple consumer lawsuits. *Id.* at 672. We determined that "[a] reasonable juror could infer that the 'objective data' representation was a direct response to the lawsuits, or to the public challenges to the safety of Firestone's tires, or to both." *Id.* So too here, a reasonable juror could conclude that Freddie Mac's statements disclaiming subprime exposure, without qualification, were likely to mislead investors who inferred that the statements broadly disclaimed exposure to risky subprime loans. *See id.* ("A reasonable juror could also conclude that the statement, without some qualification or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way, was a misrepresentation.").

Finally, we reject Freddie Mac's argument that its public disclosures remedy any misrepresentations. In *OPERS I*, we held that the statements relied on by OPERS were

actionable, despite the regular financial reports that Freddie Mac now says would have allowed investors to calculate subprime exposure for themselves. That is because "not every mixture with the true will neutralize the deceptive" and "[i]f it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *OPERS I*, 830 F.3d at 386 (quoting *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)). Further, even if investors could have calculated the portfolio's exposure to low-credit loans, Freddie Mac's assertions could still be misleading—"a reasonable and *savvy* investor might have believed, for instance, that loans to borrowers with low credit scores were nevertheless not risky because of other mitigating factors." *SEC v. Syron*, 934 F. Supp. 2d 609, 630 (S.D.N.Y. 2013).

The district court credited Freddie Mac's assertion that the "Caution loan designation was an internal risk management tool that classified loans as requiring additional scrutiny, not necessarily as 'subprime' in the traditional sense." *Summary Judgment Order*, 2025 WL 2494544, at *3. But a reasonable juror could conclude that a reasonable investor could have been misled by Freddie Mac's assertion that it had no subprime exposure, given that its internal and undisclosed data suggested significant heightened risk of a similar type.

Bear in mind that "[d]isclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress." *Basic Inc.*, 485 U.S. at 234. Section 10(b) thus demands more fulsome disclosure than the district court required. Freddie Mac's significant exposure to loans it knew its investors might consider subprime is not the type of "essentially useless information that a reasonable investor would not consider significant." *Omnicare II*, 769 F.3d at 472 (quoting *Basic*, 485 U.S. at 234). Rather, it is information that should have been disclosed "as part of a larger 'mix' of factors" that investors would consider in making their decision. *Id*. (quoting *Basic*, 485 U.S. at 234). And on defendants' motion for summary judgment, OPERS just has to show that there is a genuine dispute of fact on this issue. It has done so.

*b. Alt-A Exposure*

Taking the facts in OPERS' favor, a reasonable juror could conclude that Freddie Mac made false representations about its exposure to Alt-A loans. Freddie Mac's August 30, 2007, Information Statement states "we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that the loan should be classified as Alt-A." R. 559-15, PageID 45128. Based on that calculation, Freddie Mac classified "approximately $120 billion, or eight percent" of its SF Guarantee portfolio as Alt-A. *Id.* OPERS also points to statements by Piszel and Cook referencing the same estimate.

OPERS argues that this estimate was false. It points out that Freddie Mac's Single Family Sourcing group determined that 29% of loans being purchased were classified as "low/no doc by the lender," indicating that they were Alt-A, whereas 18% of loans being purchased were classified as Alt-A under the external definition. R. 559-104, PageID 44365. Next, it notes that the internally utilized Mortgage Credit Risk Analytics ("MCRA") definition revealed 17% Alt-A exposure across the portfolio. The MCRA definition included loans designated by one of 93 Special Characteristics Codes ("SCC") by the lenders. The publicly disclosed definition, by contrast, excluded 65 of the 93 SCCs, resulting in a far lower estimate. Finally, OPERS points to commentary on the Alt-A definitions from a Freddie Mac internal presentation, which noted the inconsistency in internal and external definitions of Alt-A, and in particular, the fact that "the 'External definition' exclude[s] some of the very largest Alt A programs." *Id.*, PageID 44367.

Freddie Mac contends that its estimate of 8% Alt-A exposure was not false based on its external definition. It points out that the MCRA definition was based on all "low/no doc" programs identified by lenders. Freddie Mac's Br. at 35. The MCRA definition, Freddie Mac argues, included low documentation loans that were not labeled Alt-A or were from borrowers with high credit quality. Thus, Freddie Mac argues, its external definition was supportable. The district court agreed, finding that Freddie Mac had justifiably included only loans whose "reduced documentation requirements indicate that the loan should be classified as Alt-A." *Summary Judgment Order*, 2025 WL 2494544, at *5 (quoting R. 559-15, PageID 45128) (citation modified). It found that the higher MCRA figure constituted "one internal measurement

. . . for risk assessment purposes, not necessarily the definitive measure of Alt-A exposure under Freddie Mac's disclosed methodology." *Id.*

But a reasonable juror could find that defendants made false representations about Freddie Mac's exposure to Alt-A loans. First, the public definition relied on by Freddie Mac states, "we have classified mortgage loans as Alt-A if the lender that delivers them to us has classified the loans as Alt-A, or if the loans had reduced documentation requirements which indicate that the loan should be classified as Alt-A." R. 559-15, PageID 45128. In applying this definition, however, Freddie Mac appears to have excluded loans that the lender identified as Alt-A, but that Freddie Mac itself determined should not be included in the external definition. In its brief, Freddie Mac justifies this by stating that some of the loans marked Alt-A by the lender through SCC code were loans of high credit quality. But that is inconsistent with the published definition, which states that loans are classified as Alt-A if the lender classifies the loan as Alt-A, not if the lender so classifies them and Freddie Mac agrees. If the published definition classified loans as Alt-A only if the lender classified the loan as Alt-A *and* the loan had reduced documentation requirements indicating it should be classified as Alt-A, perhaps Freddie Mac's classification would find support. But the use of "or" indicates that all loans designated Alt-A by the lender through SCC codes should have been included.

Second, a reasonable investor could be misled by Freddie Mac's statements disclosing 8% Alt-A exposure. As with subprime exposure, given Freddie Mac's public statements estimating 8% Alt-A exposure, a reasonable juror could find that Freddie Mac had an obligation to fully disclose its exposure to loans that a reasonable investor would consider Alt-A. That conclusion is bolstered by the fact that Freddie Mac's own employees expressed confusion and concern that the public representations did not match internal tracking.

### *c. Credit Risk Exposure*

We conclude that the remaining statements relied on by OPERS are not actionable. OPERS argues that Freddie Mac made false representations about its credit risk exposure. OPERS points to statements made by Freddie Mac's executives expressing confidence about its future. Syron stated on June 14, 2007 that Freddie Mac was "much better positioned for long-

term profitability than we were a year ago." R. 558-18, PageID 34149. Similarly, Cook stated on September 10, 2007, that Freddie Mac's "credit position is relatively strong. . . . Bottom line, at a time when many of our competitors are weakening, Freddie Mac's position is growing stronger." R. 558-17, PageID 34142.

The district court concluded that the statements relied on by OPERS "constitute either accurate historical facts, non-actionable puffery or forward-looking statements protected by the 'Bespeaks Caution' doctrine." *Summary Judgment Order*, 2025 WL 2494544, at *9. We agree. As we have explained, "rosy affirmations commonly heard from corporate managers and numbingly familiar to the marketplace . . . are at best immaterial misstatements." *Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947, 961 (6th Cir. 2026) (quoting *Omnicare I*, 583 F.3d at 944) (citation modified). Corporate leaders are "expected to be confident about their stewardship and the prospects of the business that they manage." *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)). A reasonable investor would not rely on those statements. The phrases "better positioned," "growing stronger," and "relatively strong" lack reference to objective standards for investors or the courts to evaluate.

OPERS characterizes defendants' statements as "specific comparative assertions" and statements "anchored in misrepresentation of existing facts." Reply Br. at 30-31 (quoting *In re Bank of Am. Corp. Sec. Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010)) (citation modified). But we have routinely dismissed claims arising from vague assertions of quality and optimism. *See In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (no liability for broad statements about improving quality, prioritizing quality, making customers safer, and corporate responsibility); *Newtyn Partners, LP*, 165 F.4th at 964 ("[O]ptimism alone is not a fair basis for asserting securities fraud."). The statements OPERS points to are not specific enough to compel a different result here.

*d. Underwriting Standards*

Finally, we conclude that Freddie Mac's statements about underwriting standards are not actionable. OPERS offers several statements by Syron and Cook extoling Freddie Mac's "disciplined approach in underwriting [] credit risk." R. 558-25, PageID 43673 (Syron speech);

R. 558-34, PageID 34842 (Syron speech); R. 559-33, PageID 45434-35 (Cook speech); R. 559-40, PageID 45551 (Cook speech). It also points to an Information Statement Supplement published by Freddie Mac in August of 2007 stating, "We take a disciplined approach to the acquisition of mortgage loans and generally participate in these products when we believe we are appropriately compensated for the credit risk." R. 559-15, PageID 45127.

OPERS contends that these statements were false. It points to a conclusion letter sent by the Office of Federal Housing Enterprise Oversight, Freddie Mac's regulator, stating that 80% of Freddie Mac's loan volume received exceptions to underwriting standards. R. 559-133, PageID 41497. OPERS also cites an internal report showing that "Untested Mortgage Products"—loans whose credit risk Freddie Mac could not effectively model—increased from 24% in 2006 to 35% in June 2007. R. 559-60, PageID 45888.

At first blush, the statements relied on here appear to be simply more corporate puffery. But in context, such statements can sometimes be actionable. *See Omnicare II*, 769 F.3d at 472 (noting that statements that appear to be puffery can be material when viewed in context). Multiple district courts have held that "where a bank touts but then abandons its conservative loan underwriting standards without disclosing the change, statements concerning its lending policies are materially misleading." *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 706 (S.D. Ohio 2010); *see also In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 505 (W.D. Wash. 2009). Other district courts have characterized a defendant's statements describing its underwriting approach as "disciplined" and "conservative" as "classic examples of puffery." *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 597 (S.D.N.Y. 2010); *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005). Here, OPERS has produced evidence of significant variance from Freddie Mac's touted underwriting standards, which supports its contention that the statements are actionable.

But even assuming that Freddie Mac's statements that it had a conservative and disciplined approach could be actionable in certain contexts, Freddie Mac sufficiently disclosed its changing standards for underwriting. In its 2006 Annual Report, Freddie Mac stated, "[w]e have been expanding the share of mortgages we purchase that were underwritten by our

seller/servicers using alternative automated underwriting systems or agreed-upon underwriting standards that differ from our system or guidelines." R. 548-21, PageID 30348. Freddie Mac argues that this disclosure renders its other statements not misleading. It points out that in a case involving alleged half-truths, "a statement cannot be misleading when the words spoken and the facts omitted operate on different 'levels of generality.'" *Newtyn Partners, LP*, 165 F.4th at 963 (citation omitted).

OPERS characterizes Freddie Mac's statements about its underwriting practices as "specific representations about a defined, documented practice." Reply Br. at 23. And, indeed, had OPERS identified statements by defendants touting Freddie Mac's underwriting practice in detail, a broad disclaimer about the increased use of exceptions might be insufficient. But there is nothing specific about the statements cited in OPERS' brief—rather, the statements refer in general terms to a conservative and disciplined approach to underwriting. In contrast, the cases cited by OPERS in support of its interpretation of *Newtyn* involved more specific assertions. *See Bridgestone*, 399 F.3d at 672 ("[T]he objective data clearly reinforces our belief that these are high-quality, safe tires."); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 557 (6th Cir. 2001), *abrogated on other grounds by Tellabs*, 551 U.S. at 308 (defendant stated it was "comfortable" with figures projecting specific earnings).[8]

Here, the broad statements about Freddie Mac's conservative and disciplined approach were adequately qualified by the general disclosure that its standards were changing. Had Freddie Mac made more specific representations about its underwriting standards and not disclosed the frequency of exceptions granted, a different result might be appropriate. But given the general nature of the statements, a general qualifier sufficed.

[8]OPERS also points to *FHFA v. Nomura Holding America, Inc.*, 104 F. Supp. 3d 441 (S.D.N.Y. 2015), where the Southern District of New York determined that Nomura misleadingly failed to disclose its deviation from underwriting standards. But as Freddie Mac points out, unlike the defendant in that case, it did disclose that it was increasingly deviating from underwriting standards.

* * *

In sum, OPERS has adduced sufficient evidence from which a reasonable juror could conclude that defendants made materially false statements concerning Freddie Mac's subprime and Alt-A exposure but not its credit-risk and underwriting standards.

2.

We next consider whether OPERS has produced sufficient evidence that defendants acted with scienter. To show scienter, a plaintiff must establish that the defendant made the false or misleading representation with scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976)). Scienter can be established either by knowing and deliberate conduct or by reckless conduct. *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022). We have defined recklessness in this context as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* (quoting *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)). "Recklessness requires more than negligence and is akin to conscious disregard." *Id.* (citation modified). "Before drawing an inference of recklessness, courts typically require 'multiple, obvious red flags.'" *Doshi*, 823 F.3d at 1039 (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 686-87 (6th Cir. 2004)). Here, OPERS must show that defendants acted with reckless disregard of their obligation to disclose information necessary to ensure that their statements were not misleading.

At summary judgment, we ask whether the plaintiff has adduced sufficient evidence of scienter. In evaluating scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326.

We have set out nine non-exhaustive factors that indicate a culpable level of scienter, though we do not require a plaintiff to demonstrate the presence of all, or even most, of the factors:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top

> company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig*, 251 F.3d at 552.

If a plaintiff adduces evidence to support a finding of scienter, it may still be negated by the presence of good faith or innocent motivations. *See Stavroff v. Meyo*, 129 F.3d 1265 (6th Cir. 1997) (unpublished table decision) ("[A] company's reliance on the guidance of outside auditors is inconsistent with the intent to defraud."); *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (noting that a desire to maintain a high corporate credit rating, corporate profitability, or stock price, without more, are insufficient motives to establish scienter). OPERS must produce evidence from which a reasonable juror could find scienter regarding misrepresentations related to subprime and Alt-A exposure.

To show scienter for misrepresentations related to subprime exposure, OPERS relies on *Helwig* factors two, six, three, and nine. Under factor two, OPERS contends that Freddie Mac's internal reports differed from its external statements and those of Syron and Piszel. Relatedly, under factor six, OPERS points to the contradiction between the statements at issue and recent internal reports. Also under factor six, OPERS points in particular to the email from Levy warning against the comments made in Syron's speech disclaiming subprime exposure. Under factor three, OPERS points to the fact that key statements occurred within six to ten weeks of the November 2007 stock collapse. Finally, under factor nine, OPERS contends that the individual defendants "received over 80% of their compensation from bonuses and stock-related awards tied directly to portfolio growth and stock price." Appellant's Br. at 49. It argues that this created a personal financial motivation tied to concealing Freddie Mac's subprime exposure.

Freddie Mac argues that OPERS' compensation theory did not appear in the complaint and is too generic to support an inference of scienter. It also argues that there was no material distinction between the statements at issue and its internal reports—reiterating the arguments it

makes regarding falsity. Further, Freddie Mac argues that there is no evidence Levy's email was actually sent to Syron.

We conclude that OPERS has produced sufficient evidence from which a reasonable juror could find scienter. Freddie Mac's internal reports demonstrated significant exposure to Caution loans and internal reports and comments suggest a recognition that many would consider the Caution loans to be subprime or subprime-like.[9] In fact, the individual defendants each attended an offsite meeting in February 2007 at which they were warned that Freddie Mac was "already purchas[ing] subprime-like loans." R. 559-122, PageID 44550. That was reiterated at a Board presentation in March 2007 that the individual defendants attended. R. 559-101, PageID 44294. These warnings and the internal reports described above constituted the "multiple, obvious red flags" that should have alerted the individual defendants that their comments disclaiming subprime exposure were misleading. *PR Diamonds*, 364 F.3d at 686-87.[10]

OPERS has also adduced sufficient evidence from which a reasonable juror could find scienter as to Alt-A exposure. Taking the evidence in the light most favorable to OPERS, defendants disclosed eight percent Alt-A exposure while internally tracking a far higher number. In fact, OPERS points to internal conversations questioning why the disclosures were narrowing the definition of Alt-A used for public disclosure. Appellant's Br. at 33 (citing R. 559-104, PageID 44367). *See Bridgestone*, 399 F.3d at 688 (viewing the contents of meetings as "internal reports"). From these facts, a reasonable juror could find that defendants recklessly disregarded their disclosure obligations.

---

[9]In a similar vein, Freddie Mac's "Segmentor" model estimated subprime exposure between 9.53% and 11.50% in July 2007, though it is unclear if Segmentor's estimates were reported to the individual defendants.

[10]The fact that statements by Piszel post-dated some of the relevant internal reports reflecting exposure to Caution loans does not negate scienter. OPERS' case relies in part on omissions—having made affirmative representations about subprime exposure, a jury could conclude that defendants had an obligation to disclose exposure to loans like those with a Caution designation that would be considered subprime. Even if Piszel was not aware of the internal documents until after his statements were made, a reasonable jury could conclude he had an obligation to rectify his statements once he became aware of those documents and that his failure to do so was reckless.

It is true that OPERS relies almost entirely on the divergence between internal reports and external statements and the disregard of the most current factual information. But "[w]e have described divergence as the 'key factor' to a finding of scienter." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018) (quoting *Bridgestone*, 399 F.3d at 688). In *Dougherty*, we found a strong inference of scienter where the defendant initially stated it would not need a certain form of regulatory approval but quickly reversed course. *Id* at 979-80. The initial statement proved inconsistent with internal meeting notes and the later statement. *Id.* We found that discrepancy probative of scienter under three *Helwig* factors: divergence between internal and external reports, disregard of recent factual information, and closeness in time (a factor we found "minimally" weighed in the plaintiff's favor). *Id*. at 981. Similarly, in *Astec*, 29 F.4th at 813, we found scienter as to the defendant Chief Executive Officer based primarily on the consistent theme of "relentless, unfounded optimism that was contradicted by the undisclosed facts." There, the CEO repeatedly reassured investors that a loan would be repaid despite a clear and undisclosed risk of default. *Id.* We found that the CEO's statements of optimism and non-disclosure of risks he knew about supported a strong inference of scienter. *Id.*[11] Although these cases were on a motion to dismiss, they still provide guidance regarding the type of evidence that could be indicative of scienter. And similar discrepancies indicate the presence of scienter here: defendants disclaimed subprime and Alt-A exposure without disclosing Freddie Mac's significant exposure to loans that many would consider subprime and Alt-A.

In addition to disputing the factors put forward by OPERS, Freddie Mac and the individual defendants argue that several *Helwig* factors negate scienter. *See Tellabs*, 551 U.S. at 324 ("[A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."). Freddie Mac points out that, rather than sell shares at a suspicious moment (*Helwig* factor one), Freddie Mac and the individual defendants acquired

---

[11]We acknowledge that the CEO in *Astec* also sold stock at a suspicious time, a fact not asserted here. *Id.* at 814.

additional stocks, and thus lost money. Further, contrary to *Helwig* factor five, Freddie Mac won an ancillary lawsuit.[12]

The fact that Freddie Mac and the individual defendants ultimately did not profit from these purported misstatements could convince a jury that defendants did not act with scienter, but it does not negate scienter as a matter of law. *See Tellabs*, 551 U.S. at 324 (noting that the inference of scienter need not be "irrefutable" but must be "compelling . . . in light of other explanations"). A reasonable jury could conclude that defendants failed to profit from the scheme because the risk they were concealing materialized, not because of their innocent motives. More broadly, "the absence of a motive allegation is not fatal" to a securities-fraud claim. *Dougherty*, 905 F.3d at 982 (quoting *Tellabs*, 551 U.S. at 325).

Nor does Freddie Mac's "well-developed disclosure process" negate scienter. Freddie Mac's Br. at 41. Freddie Mac cites a district court decision from the District of Columbia for the proposition that an executive's reliance on accounting and auditing personnel negates scienter. *Id.* (citing *In re Fed. Nat. Mortg. Ass'n Sec., Derivative, ERISA Litig.*, 892 F. Supp. 2d 59, 71-74 (D.D.C. 2012)). But this is not a case in which the plaintiff seeks to impute to leadership the errors of employees preparing public reports. Rather, OPERS alleges that Freddie Mac's leadership intentionally exploited ambiguities in the definitions of "subprime" and "Alt-A" to mislead investors. Defendants cannot plead ignorance as to that strategic choice.

3.

OPERS must next demonstrate reliance on the misleading statements. The reliance inquiry ensures "a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Halliburton*, 573 U.S. at 267 (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013)). "The traditional (and most direct) way for a plaintiff to demonstrate reliance is by showing that he was aware of a company's statement and engaged in a

[12]The Second Circuit affirmed the dismissal of the "ancillary lawsuit" in an unpublished opinion, finding that the plaintiff in that case failed to meet the pleading requirements for loss causation. *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp*., 543 F. App'x 72, 77 (2d Cir. 2013). Its opinion is of limited use on the issue of scienter and, in any event, the facts of that case differ significantly from the facts here. The class period in that case started on the last day of the class period in this case—the purported misrepresentations at issue here all occurred before the class period in the Second Circuit case.

relevant transaction based on that specific misrepresentation." *Amgen Inc.*, 568 U.S. at 461 (citation modified). OPERS acknowledges that it cannot prove individual direct reliance. Reply Br. at 10.

But a plaintiff "can in certain circumstances satisfy the reliance element of a Rule 10b–5 action by invoking a rebuttable presumption of reliance." *Halliburton*, 573 U.S. at 268. This so-called fraud-on-the-market theory presumes that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Basic*, 485 U.S. at 247. Assuming further that "most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *Id.*

OPERS seeks to invoke reliance through the fraud-on-the-market theory. The district court rejected this theory, referencing its conclusion at the class-certification stage that "OPERS failed to establish that Freddie Mac's stock traded in an efficient market during the Relevant Period." *Summary Judgment Order*, 2025 WL 2494544, at *12.

Freddie Mac argues that, because OPERS failed to directly address the district court's summary judgment ruling on reliance in its opening brief, it has waived the argument. "Courts and litigants often use the terms forfeiture and waiver interchangeably." *Walker v. United States*, 134 F.4th 437, 440 (6th Cir. 2025). But here, the fact OPERS failed to explicitly challenge the district court's summary judgment ruling on reliance is best analyzed as forfeiture, given the absence of any "indication that [OPERS] intentionally abandoned [the] argument rather than merely overlooked it." *Id.* at 441.

We conclude that OPERS did not forfeit its challenge to the district court's summary judgment ruling on reliance. In general, "we don't treat an argument as forfeited if a party, despite not specifically discussing the issue, raises related or supporting arguments in its briefing." *Smith v. City of Union*, 144 F.4th 867, 878 (6th Cir. 2025) (citation modified). Here, OPERS has consistently challenged the district court's conclusion that it failed to demonstrate market efficiency—the conclusion precluding it from establishing reliance through a fraud-on-the-market theory. On appeal, OPERS raised those arguments in the section of its brief

addressing the district court's class-certification order rather than the section addressing the district court's summary judgment order. But the core arguments are the same. So in challenging the district court's rejection of its price-maintenance theory, OPERS at least tangentially challenged its related holding on reliance.

Moreover, forfeiture in this context is a judge-made doctrine, the primary purpose of which is to "avoid surprise and prevent 'sandbagging'" the opposing party. *Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410, 415 (6th Cir. 2021) (quoting *Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996)). Here, defendants were well-aware that reliance is an issue in the case, and there was no nefarious intent on OPERS' part. OPERS therefore did not forfeit its challenge to the district court's summary judgment ruling on reliance. And because we have rejected the district court's conclusion that OPERS failed to establish market efficiency, we likewise conclude that OPERS can establish reliance through a fraud-on-the-market theory. On remand, Freddie Mac can seek to rebut this presumption.

4.

OPERS must also show loss causation, that is, it must show that the misrepresentations at issue "caused the loss for which [it] seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "[I]n the securities fraud context, 'a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor.'" *OPERS I*, 830 F.3d at 384 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).

OPERS seeks to establish loss causation under a theory of materialization of the risk. Under that theory, "a misrepresentation causes a stock price to *remain* inflated by preventing preexisting inflation from dissipating from the stock price." Appellant's Br. at 13 (quoting *Goldman Sachs*, 594 U.S. at 119-20).

The district court concluded that OPERS failed to establish loss causation as a matter of law. *Summary Judgment Order*, 2025 WL 2494544, at *14. But it did so having rejected the price-maintenance theory, which is a corollary to the materialization-of-the-risk theory. *Class*

*Cert. Order*, 2018 WL 3861840, at *18. In granting summary judgment on the issue, the district court noted that its denial of class certification could have been altered or amended. *Summary Judgment Order*, 2025 WL 2494544, at *14. Thus, it concluded that OPERS should have produced evidence of loss causation at summary judgment even though its theory underlying that evidence had been rejected as a matter of law. Finally, the district court pointed out that OPERS' theory of loss causation was undercut by the fact that its own expert had predicted a loss nearly a month before the disclosure OPERS now says caught the market by surprise, indicating that the market was not, in fact, surprised. *Id.* at *13. Freddie Mac echoes these arguments in its briefing.

Given our acceptance of OPERS' theory of price maintenance, we also reject the district court's conclusion that OPERS failed to establish loss causation as a matter of law. When we reversed the district court's prior grant of summary judgment in this case, we stated that, on remand, "the district court may, but is not required to, revisit the significant issues of law raised by OPERS." *OPERS II*, 64 F.4th at 736. The parties and the district court appeared to understand this to be an invitation for the district court to reconsider its rejection of OPERS' evidence and argument in support of price impact. But the district court did not reconsider its ruling except to ask, at oral argument on defendants' summary judgment motions, why OPERS did not seek reconsideration. OPERS responded that, while it disagreed with the district court's price impact ruling, it had no additional evidence or new argumentation. OPERS conceded that it could not establish damages given the legal rulings in the district court's class-certification order and made clear that it intended to appeal those rulings. The district court had rejected OPERS' attempt to demonstrate price impact through the price-maintenance theory and, as counsel for OPERS stated at argument before the district court, "you need price impact for loss causation for damages. If you don't have price impact, there are no damages." R. 594, PageID 42984. The rejection of the price-maintenance theory was thus fatal to OPERS' loss-causation theory. Now on appeal, OPERS seeks to do exactly what it said it would—appeal the order rejecting the legal theory underlying its case for price impact, loss causation, and damages. We see no reason why OPERS should have presented evidence and argument to the district court under a theory the district court had already rejected. On remand, OPERS will have to demonstrate that the purported misrepresentations at issue caused the losses it suffered.

We therefore vacate the district court's holding and remand to allow OPERS to present evidence of loss causation in light of our price-maintenance analysis.

5.

Finally, to succeed on its § 10(b) claims, OPERS must show damages. In its summary judgment order, the district court concluded that OPERS "is precluded from offering any damages evidence at trial." *Summary Judgment Order*, 2025 WL 2494544, at *16. It did so because OPERS "failed to comply with its mandatory disclosure obligations regarding damages computations." *Id.* at *15.

OPERS had an obligation under Fed. R. Civ. P. 26(a)(1)(A)(iii) to produce a damages computation. And under Rule 37(c), a party is prohibited from using information not disclosed under Rule 26(a) at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). This court considers five factors in determining if the failure to disclose evidence was substantially justified or harmless: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014)). We review a district court's imposition of sanctions for noncompliance for abuse of discretion. *Id.* at 747.

The district court concluded, and Freddie Mac argues, that OPERS' nondisclosure was not substantially justified because OPERS had no reason for failing to disclose its computation and late disclosure would surprise the defendants and delay trial. *Summary Judgment Order*, 2025 WL 2494544, at *16. The district court also noted the importance of the damages calculation to OPERS' claims. *Id.*

As with the issue of loss causation, the district court's erroneous rejection of OPERS' underlying theory excuses OPERS' failure to present evidence of damages at summary judgment. We discount the concerns raised by Freddie Mac and the district court about unfair surprise and the risk of delay to trial. OPERS acknowledged to the district court that it could not

survive summary judgment given the class-certification order rejecting its theory of price impact. *See* R. 594, PageID 42985 ("And on both loss causation and damages, Dr. Tabak clearly opined that he was not able to calculate -- to do a loss causation analysis or calculate damages consistent with this Court's price impact analysis."). OPERS has thus been candid throughout this litigation that it cannot present evidence of damages unless rulings from the district court's class-certification order are overturned on appeal. There was no chance for trial to go forward as scheduled after summary judgment—OPERS conceded that the summary judgment against it was warranted based on the district court's earlier ruling—and thus there was no risk that defendants would be caught by surprise. On remand, OPERS must produce a damages calculation that defendants will have the opportunity to fully interrogate.

* * *

In sum, we conclude that OPERS can proceed on its § 10(b) claims based on misrepresentations concerning subprime and Alt-A exposure. On remand, OPERS will have the opportunity to demonstrate loss causation and damages in a manner consistent with its theory of fraud.

**B.**

In addition to bringing § 10(b) claims for false or misleading statements against defendants Syron and Piszel, OPERS brings § 20(a) claims against all the individual defendants for "control person" liability. Notably, OPERS points to no statements made by McQuade, so McQuade's only potential liability is as a control person.

A § 20(a) "control person" claim "is derivative of [a] § 10(b) and Rule 10b-5 claim[]." *Dougherty*, 905 F.3d at 984. The district court dismissed the § 20(a) claims because it determined that there was no underlying securities violation. *Summary Judgment Order*, 2025 WL 2494544 at *17. Given our conclusion that OPERS can proceed on its underlying securities violation, we also reverse the district court on this point.[13] We remand to the district court for reconsideration of OPERS' § 20(a) claims in light of this opinion.

---

[13]The district court also determined, as an independent basis for rejecting control person liability, that the individual defendants "acted in good faith and did not induce any alleged securities law violations." *Id.* "Good faith

## IV.

For the reasons stated, we **REVERSE IN PART, VACATE IN PART,** and **REMAND** for further proceedings consistent with this opinion.

---

is an affirmative defense in section 20(a) claims." *Frank v. Dana Corp.*, 646 F.3d 954, 963 (6th Cir. 2011). But we have concluded that a reasonable juror could conclude that defendants acted with a culpable scienter as to the misleading statements made in Freddie Mac's filings, facts that support a finding that defendants did not act in good faith. So we reverse the district court on this point as well.

## CONCURRENCE

THAPAR, Circuit Judge, concurring. Securities litigation can be lengthy and complex. This case is Exhibit A: It's trudged on for 18 years, delaying closure for all parties involved. Judges should do their best to accelerate and simplify complicated lawsuits. So in the hope that this case doesn't last another 18 years, I write separately to clarify three distinct issues that recur in complex cases like this one—and to urge all involved to make this case a priority going forward.

First, the majority rightly approves OPERS's price-maintenance theory of securities fraud. I write to further explain why price maintenance is a valid securities-fraud theory. Second, the district court made summary judgment more complicated than it needed to be. Because this case involved a securities class action, the district court demanded that OPERS produce evidence giving rise to a strong inference of scienter at summary judgment. But that demand raises the bar higher than the Federal Rules have set it. Third, this litigation has lingered for far too long, hurting the parties, courts, and taxpayers. Attorneys and judges should use all the tools at their disposal to facilitate the movement of cases so they don't drag on.

### I.

The district court's erroneous holdings all stemmed from one fatal flaw: its rejection of OPERS's price-maintenance theory. As the majority explains, that theory recognizes that a company can distort its stock price through false statements that keep the price steady when truthful disclosures would have caused it to fall. It makes sense that plaintiffs can pursue such a theory, and I write separately to further elaborate on the majority's thoughtful analysis.

For starters, the price-maintenance theory is valid as a matter of logic and economics. If a company's stock price is already inflated, a misrepresentation can artificially maintain that inflation by confirming the market's expectations. In other words, the misrepresentation can prevent the price from falling by as much as it would have if the company had been truthful.

So the economic effect of unlawful price maintenance is that a stock's price is higher than its real value—no different from a classic securities-fraud violation.

Consider a hypothetical that everyone would agree violates the securities laws. Suppose the market expects a company to earn profits of $100. In reality, the company earns only $80, but the CEO falsely reports profits of $110. The company's stock price would jump because the CEO's report exceeded the market's expectations, whereas a truthful disclosure would have sunk the price. There's no doubt that violates our securities laws.

How does the price-maintenance theory differ? The setup is the same: The market expects $100 in profits, while the real profits are $80. But this time, the CEO falsely reports $100 in profits (not $110). So instead of jumping, the stock price stays the same. But just as before, the misrepresentation prevents the stock from falling to its true price, as it would have with a truthful disclosure. And that's the critical point. When an investor buys a company's stock, he relies on the price being a *true* reflection of the company's value. So the investor is harmed by the company's misrepresentation whenever it has kept the stock's price above its *true* price. The harm doesn't turn on whether the misrepresentation actively raised the stock's price above its original, previous price. It stems from the fact that the misrepresentation raised or kept the stock's price above its true value. At the end of the day, the misrepresentation has led to the investor paying more for the company's stock than it's really worth, and that's what matters.

To see why, just tweak the hypothetical. Suppose the company's true profits are still $80, but the CEO reports $90—falling short of the market's expectations of $100. The stock price would fall, but not as far as it should have. That means there'd still be a gap between the stock's true price and the price that investors relied on. As Judge Easterbrook put it, the version of the hypothetical where the stock price rises is "just a mirror image" of the version where it falls, only "in black ink, rather than red." *Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010). Whether the market price goes up, down, or sideways, investors depend on it being accurate when they purchase a security. So disclosures that distort the security's true price may be fraudulent. The price-maintenance theory is just one application of that straightforward principle.

Nevertheless, the district court rejected OPERS's invocation of the price-maintenance theory, citing a Southern District of New York case from 2008. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08-CV-160 (BYP), 2018 WL 3861840, at *18 (N.D. Ohio Aug. 14, 2018) (citing *In re Credit Suisse First Bos. Corp. (Lantronix Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 145 (S.D.N.Y. 2008)). But since 2008, the Second Circuit has repeatedly approved the price-maintenance theory. *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017). The Second Circuit recognized that when a defendant's misstatement "*prevents* [the] preexisting inflation in a stock price from dissipating," he can't avoid liability simply because his misstatement didn't cause the stock price to rise. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (alteration in original) (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1317 (11th Cir. 2011)).

The district court's rejection of the price-maintenance theory also tainted its market-efficiency analysis. OPERS tried to show that Freddie Mac traded in an efficient market—meaning one where the stock price rapidly incorporates and reflects all publicly available information. A market-efficiency analysis involves a multifactor test whereby courts consider five so-called *Cammer* factors and four additional structural factors. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989). The fifth *Cammer* factor considers whether there's a history of immediate changes in a stock price following a disclosure. *Id.* at 1287. As the majority explains, the district court wrongly elevated that factor above the others, ignoring commonsense indications that Freddie Mac traded in an efficient market. But there's another problem with relying on the fifth *Cammer* factor. The question of whether the disclosures immediately moved the stock price is of little relevance in a price-maintenance case. If OPERS is right, Freddie Mac's disclosures were fraudulent because they *froze* its stock price. So, had the district court recognized the price-maintenance theory's validity, it should have put little weight on *Cammer* factor five. These two incorrect holdings permeated the district court's entire analysis.

II.

The district court also made a subtler legal error. Securities-fraud plaintiffs must prove scienter—that the defendant knew his statement was false. What must a plaintiff show to survive

summary judgment on the element of scienter? That question is the subject of a circuit split, and our court hasn't squarely weighed in. The district court nevertheless required the plaintiff to advance evidence justifying a "strong inference" of scienter. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08-CV-160 (BYP), 2025 WL 2494544, at *17 (N.D. Ohio Aug. 29, 2025). But that's not quite right.

The problem? Summary judgment is the wrong time to apply the strong-inference standard. True, under the Private Securities Litigation Reform Act of 1995 (PSLRA), a securities-fraud class-action complaint must include allegations raising a "strong inference" of scienter to survive a motion to dismiss. 15 U.S.C. § 78u–4(b)(2). But "[a]lthough the PSLRA substantially raised the *pleading* standard for scienter, it did not change any *substantive* intent requirements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008). So district courts can't just import the elevated pleading standard into their review at summary judgment.

In fact, three of the four circuits that have squarely addressed this issue have held that the strong-inference standard doesn't apply at summary judgment. After all, the standards for the pleading stage and for summary judgment are different. At the pleading stage, a court asks "what a reasonable person *would* think" if the plaintiff's allegations were true. *Id.* at 1239. But at summary judgment, the court must ask "what a reasonable person *could* think" based on the evidence advanced before trial. *Id.* In other words, "the court's task is to determine based on the record whether there is a genuine issue of material fact requiring trial." *Costello v. Grundon*, 651 F.3d 614, 636 (7th Cir. 2011); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000). So in setting a pleading standard, "the PSLRA" didn't "change[] the well-established summary judgment standard." *Costello*, 651 F.3d at 636.

Only the First Circuit has come out the other way. *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001). It argued that the "reasoning" behind the "heightened pleading requirements is at least as forceful" at summary judgment. *Id.* That's because the First Circuit envisioned the pleading stage and the summary-judgment stage as sitting on a continuum with a plaintiff needing more evidence to survive a defendant's motion for summary judgment. *See id.* So the First Circuit concluded that if a strong inference of scienter is needed at the pleading stage, at least the same must be required at summary judgment. *Id.*

In my view, the Eleventh, Seventh, and Ninth Circuits have the better argument. We regularly hold parties to the normal summary-judgment standard even if they have a higher or lower pleading standard. For example, a pro se complaint faces "less stringent standards" at the pleading stage. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But pro se litigants must still raise a genuine issue of material fact to defeat a motion for summary judgment. *See, e.g.*, *Reneer v. Sewell*, 975 F.2d 258, 259–60 (6th Cir. 1992). And False Claims Act cases, like securities cases, have a heightened pleading standard. *United States ex rel. Laughlin v. Radiation Therapy Servs., P.S.C.*, 148 F.4th 791, 798–99 (6th Cir. 2025). Yet we still apply the normal summary-judgment standard in those cases too. *Id.* at 802. So even if Congress alters a pleading standard, that doesn't give us the power to alter the summary-judgment standard.

Plus, the rationale for changing the pleading standards in the PSLRA doesn't apply at summary judgment. Congress passed that act "[a]s a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). That check was necessary because plaintiffs can ordinarily survive a motion to dismiss by pleading facts without providing any evidentiary support. So if plaintiffs simply pepper their complaints with enough facts to survive a motion to dismiss, they can then saddle defendants with burdensome discovery requests, which might even coerce a settlement. But summary judgment is different. At that stage, the nonmoving party must produce evidence sufficient to establish a genuine dispute of material fact. Fed. R. Civ. P. 56(a). Because it requires evidence—not just allegations—the normal summary-judgment standard is sufficient to guard against abusive or frivolous litigation. Applying the PSLRA pleading standard at summary judgment would hold plaintiffs to a doubly high burden, which isn't required by the statute or common sense. So the district court erred by imposing that burden on OPERS.

To be fair, the district court's misstep was understandable. Our circuit has used the "strong inference" of scienter language in a summary-judgment case before. *See Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir. 2007). But that language wasn't a holding. Instead, it appeared in a stray quote copied and pasted from a motion-to-dismiss case. *Id.* (quoting *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 683 (6th Cir. 2005)). For a statement to be a binding holding, "it must be clear that the court considered the

issue and consciously reached a conclusion about it." *Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019). Since *Brown* didn't do that, its errant language doesn't bind us. So going forward, district courts shouldn't impose the PSLRA's heightened pleading standard at summary judgment.

III.

Finally, this case has dragged on for 18 years with no end in sight. Courts and parties alike must remember that they have a joint obligation "to secure the just, speedy, and inexpensive determination" of every case. Fed. R. Civ. P. 1. The resolution of this case has been anything but just, speedy, and inexpensive. That's unfair to the parties, the court system, and the American people. Fortunately, there are plenty of tools available to help district courts and parties to live up to Rule 1's command.

Start with the first problem: the costs to the parties. We don't yet know what the total attorneys' fees and costs will be in this case. But past securities cases make clear that the costs to the parties will be high. For example, one securities case settled after 16 years for $100 million plus $33 million in plaintiffs' fees. *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 3:02-CV-1152-M (BMGL), 2018 WL 1942227, at *17 (N.D. Tex. Apr. 25, 2018). Defendants' costs, while not public, are often even higher than plaintiffs'. So at a minimum, we can estimate Halliburton's costs to be at least $33 million. Add that all up, and you get a total cost of around $66 million. OPERS's suit has already been going on for 18 years, so the cost may similarly exceed $50 million.

In addition to the financial burden, the parties have been forced to spend 18 years of their lives litigating this suit. The plaintiffs are Ohio retirees who still haven't been able to recover any of their alleged losses. The individual defendants are now in their 70s and 80s. They've endured nearly two decades with this case hanging over their heads. Civil litigation is stressful and disruptive, and prolonged litigation has a negative effect on litigants' mental health.[1] So judges should be cognizant of the mental-health costs and the human toll of delay. In fact, this

[1] *See generally* Thomas G. Gutheil, et al., *Preventing "Critogenic" Harms: Minimizing Emotional Injury from Civil Litigation*, 28 J. Psychiatry & L. 5 (2000); *see also, e.g.*, Miguel Clemente & Dolores Padilla-Racero, *The Effects of the Justice System on Mental Health*, 27 Psychiatry, Psychol. & L. 865 (2020).

case has dragged on for so long that one of the original defendants passed away while the litigation was pending and now won't get to see this case to its resolution. When a case outlives one of the litigants, something is seriously awry.

Litigation delays also burden judges and the federal courts. Recognizing this, Congress mandated that judges report any cases that "have not been terminated within three years of filing." 28 U.S.C. § 476. If this case had been resolved in a timely fashion, it would've freed up space for other cases. So the delay in this case harms not only these parties, but also other unrelated parties who now must wait in line for a decision in their cases. Plus, prospective plaintiffs might be discouraged from pursuing meritorious cases if they think they must spend tens of millions of dollars and wait nearly two decades for a resolution.

All these concerns raise an important question—why has the resolution of this case been so slow? This case has involved multiple complaints, repeated extensions, and long periods while motions have been pending before the district court—up to a year in one instance.

District courts and litigants have tools at their disposal to prevent cases from dragging on as long as this one has. For example, judges can set firm discovery deadlines and speedily resolve any discovery disputes.[2] They can issue oral rulings from the bench so that the parties don't have to wait for a written opinion—especially when those rulings aren't reviewable (for example, a denial of a motion to dismiss for failure to state a claim). And they can set fixed deadlines for motions while granting only the most necessary extensions. These mechanisms are just a small sampling of a district judge's tools to cut down the length of litigation.

The parties have recourse as well. First, they shouldn't request repeated extensions. Second, they should follow up on outstanding motions. A district judge has a responsibility to dispose of motions that have been pending for six months. Indeed, Congress has recognized the dangers of undue backlog and sought to hold district courts accountable for motions pending for longer than six months. *See* 28 U.S.C. § 476. Congress believed that public shaming would be enough, but sadly, that hasn't worked as well as it should have. So if a district judge is sitting on a motion for longer than six months, the parties have options. They can first request a status

[2] *Differentiated Case Management*, U.S. Dist. Ct. N. Dist. of Ohio (last accessed Aug. 14, 2026).

update from the judge. District judges are busy, and sometimes things just slip through the cracks—a gentle reminder may be enough.

If that doesn't work, then litigants should jointly petition us for a writ of mandamus. We all have an obligation to move cases along, and when "a district court persistently and without reason refuses to adjudicate a case properly before it, the court of appeals may issue the writ." *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 661–62 (1978). Indeed, we've recognized that "compel[ling] the district court to issue a final judgment . . . is perhaps the core purpose of the writ." *In re Syncora Guar. Inc.*, 757 F.3d 511, 516 (6th Cir. 2014). So as other courts have recognized, mandamus is an appropriate tool for combatting the lengthy delays that inspired Congress's six-month clock. *Madden v. Myers*, 102 F.3d 74, 78 (3d Cir. 1996). After all, the "sense of Congress" is that cases "should be adjudicated within six months," which counsels in favor of mandamus—even if six months isn't a firm "deadline." *Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 453–54 (6th Cir. 2022). Congressional policy and common sense agree: When judges unduly delay, parties should seek mandamus.

It's true that mandamus is an extraordinary remedy. And I recognize parties may worry that a mandamus petition will draw the district court's ire. So I encourage litigants to cite this opinion if anyone questions why they are seeking mandamus. We wouldn't tolerate it if a litigant took nine months to a year to file a brief. Likewise, we shouldn't tolerate it if a district court takes that long to issue a decision.

Of course, there might be unique circumstances that make the delay necessary, but those should be few and far between. A court of appeals should consider several factors in determining whether to grant mandamus, including: (1) how complex is the motion (of course, rarely will a year's delay be justified even when the motion is complex); (2) are there systemic delays in that particular case; (3) does the judge have a particularly heavy caseload[3]; (4) did the

---

[3] I recognize that some district courts face a heavy caseload and are far more underwater than others. And of course, some districts have many complex cases, whereas the cases in other districts are more straightforward. *See* Admin. Off. of the U.S. Cts., *Table X-1A—U.S. District Courts—Weighted and Unweighted Filings per Authorized Judgeship* (June 30, 2026) (weighting the cases by complexity and cataloging the number of weighted filings per judgeship with the Northern District of Florida as the heaviest at 1554 and the Southern District of West Virginia as the lightest with 190). And sometimes a court has several open judgeships, which increases the caseload of the existing judges. Given this variance in caseload and case complexity, there likely isn't a one-size-fits-all

judge inherit the motion from another judge and, if so, how long has it been with the new judge[4]; and (5) does the judge have a number of motions on the six-month report or several cases on the three-year list. When these factors indicate a serious case-management problem, mandamus is an appropriate remedy.

Some may think it's easy for me, as a circuit judge, to say that district courts should be moving cases along more quickly. But as a former district judge myself, I'm well aware of the demands on district judges. They must "balance administering just and lawful outcomes with the need to move cases along." *In re Univ. of Mich.*, 936 F.3d 460, 463 (6th Cir. 2019). Being both a skilled adjudicator and a capable, efficient case manager is no small feat. Still, there are plenty of district judges who've never had a single motion pending for more than six months. And if district judges don't have the time or resources to resolve motions, they should enlist the help of their colleagues or circuit judges, many of whom would be happy to chip in.

* * *

Justice delayed is justice denied. Judges and litigants alike have a duty to promote the efficient resolution of cases. When they fail to do so, it hurts the parties, the court system, and the American people. And it closes the courthouse doors to deserving litigants who are deterred from vindicating their rights because of the time and expense involved. This case is the poster child of what happens when the litigation lingers—judges and lawyers turn to other things. That's not acceptable. Eighteen years is far too long. Going forward, everyone needs to make this case a priority.

---

answer here. But absent an outside solution, we as courts need to think creatively about how to best use our resources. Enlisting the help of less overworked judges is one way to alleviate the burden on those with the heaviest caseloads.

[4]There's a practice in many districts to transfer old motions to a brand-new judge. Hopefully, if judges resolve their motions on a timely basis, there should be fewer outstanding motions to transfer. Regardless, Chief District Judges should stop this practice. Judges have an obligation to the parties to timely resolve pending motions. But transferring them to a new judge only exacerbates the problem of delay. First, the new judge has to get up to speed on the case. Second, the new judge is likely to fall behind on his own cases as he deals with longstanding motions that other judges didn't resolve. Instead of allowing passing motions to be the default, Chief District Judges should work on an ongoing basis to obtain help for their colleagues who have overly burdensome caseloads.